We'll hear the Atlantic Specialty Insurance Company. May it please the Court, good morning. My name is James Carbin, Counsel for Appellant, Atlantic Specialty Insurance Company. This case involves a dispute under marine insurance policy. Excuse me. This case involves a dispute under a marine insurance policy, and in particular the sinking of the barge Mike Bay at Steeplechase Pier on Corning Island. I'd like to first speak about the doctrine, the marine insurance doctrine of almost good faith. Coastal breached its duties to Atlantic Specialty to make full disclosure of the risk when it presented the risk to Atlantic seeking coverage for the vessel. In particular, Coastal presented a survey report, captioned, A Insurance Underwriting Advice. But does that duty extend after the time the contract is agreed to? In fact, your Honor, during the request for insurance, the broker admitted that they needed to submit a survey report, and they promised a survey report to the underwriter. And that report, the preliminary insurance underwriting survey report, was provided the very next day. It looks like, though, the argument is that there was a policy agreed to on Friday, but it wasn't until Monday that the survey came in. So my question is, was there a contract, an insurance contract, on that Friday with the exchange of those e-mails, or do you believe that duty of utmost good faith even proceeds after there's a contract? Which is your position? There's no contract? Actually, both, your Honor. Number one, that the agreement that was reached on Friday afternoon in an urgent basis at Coastal's request, they wanted to cover that Friday afternoon because they had operational concerns. That agreement was predicated upon the understanding between the underwriter and the broker that the survey report would be provided. And, in fact, the survey report was provided the very next business day. Secondly, I agree with your Honor that the duty of utmost good faith and the authority to support this is a continuing one. The door doesn't shut. I didn't say it was. I was asking you whether you thought it was. Well, I do, and I believe the authority. I mean, that's a question in admiralty law, isn't it? I don't believe it is a question, or I believe it's been resolved. The duty of utmost good faith is a continuing one. If the insured has material information about a risk, he's obligated to communicate that to the insurer, and that obligation persists throughout the entire period. Even during the full time of the insurance contract. So say this was two months later that they had another survey done, and they said there's something wrong with this vessel. They're supposed to contact the insurance company and say, by the way, you know, you may want to reconsider your coverage here because there's something wrong now with the vessel that we didn't know two months ago. Laws control normally dictates that. A responsible insured is going to be monitoring his equipment. There's a problem with it. He attends to it. If there's something wrong with it, he may be putting a claim in. If there's something materially wrong with it, if he finds a structural problem that was previously unknown, yes, he has an obligation to disclose that to his insurer. And normally what happens is he discloses in the context of, hey, I'm putting my boat in the shipyard and I'm getting it fixed for whatever reason. But especially on an account like this, a groundwater account dealing with tugs and barges that come and go all the time, there's a lot of communication between the underwriter and the broker and the insured about the equipment and what's being done with it. So. It should be. So getting to the, with respect to the utmost good faith issue, you've got a trial. You've got Fairchild, as I understand it, saying that he issued a quote after confirming that the job site for Mike B was in Brooklyn. Correct? He was unaware of that at the time. The quote was issued Friday afternoon and the coverage was banned Friday afternoon. But he had the address, didn't he? The address was an office in the middle of Long Island. He didn't know where the barge was. Based upon the survey report he got, the survey report certified that the barge was fit for the intended service. Well, if Coastal Charters, if with Sterling, had said that the job site was at the steeplechase pier, how would that have, what difference would that have made in Fairchild's quote? Oh, all the difference in the world, Your Honor. Everyone who has testified, including Coastal's own experts, have testified that there is a material difference between the vest operating on the north inlet side and it operating at steeplechase pier on the ocean side. For the obvious reason that on the ocean side you were exposed to wind and waves, which is exactly what Coastal claims caused this loss. That risk would not exist up in the inlet northern side. So the preliminary insurance survey report that was given to Mr. Fairchild represented that the barge was fit for its intended service, which the surveyor confirmed with Coastal. He was told it was going to be on the inlet side, and he explicitly asked whether it was going to be on the ocean side and was told no. The surveyor testified he was. You're making all these factual arguments on the standard of review. Your position is that it's de novo and not the usual error? Yes, Your Honor. Because of the circumstances with Judge Wexler's passing, this was taken over by a successor judge who did not see any other witnesses. Rule 52 only provides deference to a trial judge who has seen the witnesses. But does it say that? It says 52A6 says findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous. And it goes on to say, Your Honor, in that same paragraph, that the appellate court should provide, should give due regard to the trial court in terms of its ability to see the witnesses. You had the opportunity to recall witnesses if you had wanted to. Well, in fact, I suggested that one of the primary witnesses, Mr. Gunderson, be recalled, and that is not the case. You left it up to the trial judge, right? You didn't ask for the witness to be recalled. I think the way it was phrased was if the court wanted to, it could. I objected to his deposition testimony at trial. And ultimately, rather than say, ultimately the court accepted, the trial judge accepted that deposition testimony. But you didn't make a formal request that he be recalled. It was language like perhaps, or it was in the form of a suggestion. I suggested it, Your Honor. I don't know that there are any magic words to ask for a witness to be recalled. What more would Gunderson have said? His deposition is extensive, talks about everything that day. What would you want him to talk about, even if you had made it more clearly? Well, what we wanted to confront him with was the fact that he gave inconsistent statements to the investigators right after the casualty compared to what he testified to at his deposition. Right after the casualty. Was that brought out at his deposition? I'm sorry? Was that not the inconsistencies? Were they not brought out at his deposition? It was not. It was not. They could have been brought out at his deposition? We were unaware of it at the time. I see. Thank you. I would also, moving to a second point that I wanted to highlight for the court, we consider that the trial judge made a reversible error in excluding dozens of photographs taken by Mr. Colletti, a professional engineer and marine surveyor, when he attended on board the barge and viewed not only the barge, but also the under deck compartments of the barge. And the trial judge arbitrarily determined that those photos and his associated testimony should not be allowed. I think he just had heard enough and had already come to a conclusion in his mind, but obviously he never formalized that because he didn't have the opportunity. But the exclusion of that evidence, including the exclusion of evidences by investigators, marine engineer investigators, who is hired by Coastal itself, who is not allowed to offer his report or his conclusion that the barge sank because of its poor condition, or the New York City marine engineer investigator, who reached a similar conclusion. They were not allowed to testify, and they should have been. And I believe that was prejudicial with the successor judge, who determined that Atlantic did not meet its burden to prove that the vessels weren't seaworthy. Obviously, the successor judge did not have the benefit of those witnesses' testimony. On the issue of seaworthiness, you say, as I understand it, that what was needed, what was required, was a 24-hour standby tugboat. That is what Coastal's own surveyor said he would have required, had he known the vessel was going to be used on the ocean side of Corning Island. And what's significant about that, Your Honor, is if there was a standby tug, as he would have recommended, had he known where the barge was going to be used, the barge would have been moved. Does it have to be there all the time? 24-7 is what Coastal's own surveyor testified to he would have recommended. If it were 10 minutes away or 20 minutes away, would that be all right? Coastal's argument is that the barge sank when it waited hours after a call to tug to come move the barge that morning. Obviously, it wouldn't have had to have waited if its own surveyor's recommendation had been adhered to at the standby tug. Thank you. Thank you. Eric Matheson. Good morning, Your Honors. Eric Matheson from the firm of Freehill, Hogan & Mahar, with my colleague Michael Hunger for Coastal Environmental Group in this matter. Your Honors, on this appeal, Atlantic bears the heavy burden to demonstrate why the district judge's decision should be overturned. A review of that decision makes clear that despite the fact that Judge Azraq was a successor to Judge Wexler, the record was very thoroughly considered, and it is an extensive record. In addition, the judge properly held a conference to determine whether any additional witnesses One of the reasons for giving deference to a trial judge is the trial judge's ability to observe the witnesses. That did not happen here. So why should we still give deference to the trial judge's factual findings? Your Honor, the precedent in this court, as well as the direction from the Second Circuit as well as the direction from the Supreme Court, excuse me, is that it is a question of judicial function, and it's the function of the district court to handle the trial of a case in the first instance. Even in the situation of a successor judge, those factual findings are accorded deference. In this case, Atlantic only raises a single witness that it suggested the district judge, using the power that the successor judge had, may wish to recall. Now, if there was a great controversy over Mr. Gunderson's testimony or the testimony of the experts or any other witnesses, why were those witnesses not recalled? With respect to the discussion of the photographs, which Atlantic alleges that it was denied the opportunity to put in, there are two salient points. The first is, if a party has evidence that is compelling and substantial, it doesn't wait until the end of producing 1,000 photographs to show that to the district judge. The second is that in this case, Atlantic had a unique opportunity, because when the case was transferred to Judge Azraq, it could have asked for the recall of its own expert, Mr. Colletti, and explained to Judge Azraq that there were additional photographs which were relevant to salient material points of its case, which it wanted to add and supplement to the record to ensure that in making her decision, Judge Azraq was fully informed as to the evidence. None of that happened. Can I ask you? Certainly, Your Honor. Move on to a slightly different point if you're finished with that point. Seaworthiness. Seaworthiness, as I understand it, has two components. You look at both physical condition, whether the physical condition of the boat or the ship or the vessel is suitable, and also on adequate provisioning. So looking at the express seaworthiness warranty of Coastal's policy, it requires Coastal, and I quote, to exercise due diligence to keep the vessel seaworthy and in all respects fit, tight, and properly manned, equipped, and supplied. The district court certainly looked at the physical condition of the vessel, but it didn't assess whether the absence of a standby tugboat rendered the Mike B. unseaworthy. Isn't that a problem? It is not, Your Honor. The reason that it is not is that the presence or absence of the standby tug is an operational consideration, just as is the pulling of the spuds, which was the cause attributed in part to the loss. Whether or not a tug was on standby did not alter the physical structure of the barge or its inherent seaworthiness. And, in fact, if it's needed, if the tugboat is needed to ensure seaworthiness, then how could not examining seaworthiness also in the context of the tugboat, how could that not be an error? The tugboat, Your Honor. I don't know the answer to that. I'm just raising it as a question. The tugboat, Your Honor, is not required for seaworthiness in as much as when you look at any vessel, there are conditions of wind, weather, sea, and other perils which can exceed that vessel's ability to survive. One would cross the ocean in a cruise ship, but not likely undertake that same voyage in an open canoe. And the difference is that there are operational restrictions in where you use a vessel and how you use the vessel. And those are the types of operational considerations that were at play here, but they did not affect the inherent seaworthiness of the vessel itself. They wanted the standby tug not because of concerns about the vessel, but because of the weather. Is that right? It is, Your Honor. And, in fact, the fullness of both what the surveyor provided and what the other experts stated was that the weather conditions with a spud barge are very critical, and if the spuds had been left down, there was testimony from several witnesses that any barge would have sustained damage in a similar condition. And so it is Coastal's position that that was an operational addition that the surveyor contemplated after the fact that might have been in place, but it did not alter the seaworthiness of the Mike B itself. Did Atlantic know where the vessel was going to be located on Friday? The Friday they bound the coverage, Your Honor. Is that correct? They did. And they knew that from the fact that, first, the policy limit itself, as their own witness testified, the underwriter testified, was the inland waters of the United States in and around Brooklyn, New York. And there's no issue, and Mr. Fairchild himself testified at trial, that once he saw that it was being used in Coney Island, which is inland waters in and around New York, he looked no further. What he had in front of him at the time that he bound coverage was a copy of the charter, and that specified an address on Surf Avenue in Coney Island, which is adjacent to Steeplechase Pier where the work was to be conducted, Your Honor. So what do we make of the Meyer House — sorry, Meyer Rose email the following Monday, the barge will be working in protected waters at Coney Island, correct, not on the ocean inlet side? That's just irrelevant? Well, on that point, Your Honor, Mr. Meyer Rose was never able to provide a definition that accorded with any legal standard as to what protected waters meant. It was an idiosyncratic statement. As to where the barge was going to be used, the ocean inlet side, there was no testimony below as to what those sides or places were. The south shore of Coney Island, as is demonstrated by the charts and diagrams that are in exhibit, runs east-west along the bottom of Long Island. You don't think you can understand what he meant by that? What he meant by it was which side of Coney Island is it on, the one facing the ocean or the one facing the sound, right? That's the way I read it, but I'm no admiralty lawyer. I don't think that it's the only reading, Your Honor, and that's part of the problem, is that Mr. Meyer Rose was unable to define precisely how to read that and, in fact, conceded that an objective reviewer of his report. Well, Morehouse knew what he meant, right? I'm sorry, Your Honor? Who's the woman that responded to him when he asked Christine? Yeah, Christine Morehouse said, oh, yeah, it's on the protected side, right? This isn't news to you, is it? It's a big deal in this case. She said it was not going to be used in the ocean, and it was not. It was used in the inland waters of the United States on the south shore of Coney Island. So there's no ocean around Coney Island is your argument, right? Our argument is that the barge was used fully within the geography specified in the policy and that the underwriter was unconcerned with that location. And so there was no misrepresentation, nor importantly, Your Honor, was there any failure to provide information to Atlantic. It's important to note that each time Coastal received a document from its surveyor, the first thing it did was turn around and provide that document. So her email specifically is, hi, Jason. Yes, that is correct. It will be in protected waters at Coney Island, not in the ocean. Everybody knew what she was talking about, right? I see my time is up, but if you'd like me to answer, I will, Your Honor. I would like an answer if the Chief Judge will permit you to answer that question. Yeah. She says that it's not going to be used in the ocean, Your Honor, and it was not used in the ocean. It was used on the south shore of Coney Island. And the precedent of this Court going back more than 100 years is that that is within the inland waters and it's within the coverage of the policy. And the risks that have been discussed and that Atlantic alleges were different, those risks were not material to their own underwriter. Their own underwriter wasn't asking any questions about where the barge was going to be used beyond noting that the charter provided that it was being used in and around Brooklyn, New York. I have a question about the alternative basis for the Court's ruling, which I understand to be that Gunderson was negligent for, and I'm quoting, failing to heed the weather forecast and act earlier to have Mike B's spuds lifted. But the judge indicated in her findings that when Gunderson checked the weather the evening before the incident, the prediction was only for one-foot seas. And the Court also found that the waves were four to six feet when the Mike B was lost, while the emergency plan that Coastal had basically focused on situations where the waves reached six to eight feet. So what support is there for the conclusion, given these factual findings, that Gunderson was negligent? Well, Your Honor, Mr. Gunderson, as the operator of the barge, had discretion to execute the heavy weather plan. And when he looked at the specific conditions that were presented to him, he elected to do that. I think to have a reading of the plan that requires him to wait until the most extreme condition has developed really wouldn't be a fair reading of that document. He had seen throughout the course of the morning that the weather was getting worse, and so he executed that plan. The experts in this case, including Atlantic's own expert, were in uniform agreement that had those spuds been lifted, had the plan been carried out, the Mike B would not have been lost. And for all those reasons, Your Honor, we think that the district judge's determination should be fully affirmed. Thank you. Thank you. Your Honor, there's no question that if the spuds had been raised and the barge had been towed away, they wouldn't be lost. That's the whole reason Mr. Miro has recommended a standby tug in the event that the conditions that are complained about occurred. Your Honor asked about the definition of seaworthiness, and Your Honor is correct. The classic definition of seaworthiness recognized by the authorities and the courts is that a ship is fit in all respects for the intended service. The intended service here by coastal was a steeplechase pier on the ocean side of Coney Island. And we shouldn't be parsing the e-mail that Ms. Morehouse sent to Miro. They know what they were talking about, and they clearly understood that. Miro's was asking where this barge is going to be used for the very reason of considering its seaworthiness for the intended service. He's told that it's going to be used on the north side, not on the ocean side. He takes that into account in issuing his preliminary insurance advice that goes to the Underwriter Fairchild Atlantic and certifies that this barge is safe to be used for the intended service, i.e., it's seaworthy for where it's going to be used. He doesn't know, and Atlantic certainly doesn't know, that the barge is actually planned to be used and is going to be used and is used on the ocean side, which is a materially different risk according to everyone that has testified in the case. That's exactly why Miro has asked the question in the first place. Where is this barge going to be used? What service is it going to be used for? Because that affects its ability to perform and its ability to withstand whatever conditions it's going to be exposed to. If he knew it was going to be used on the ocean, he would have made an entirely different report as he testified, and he would have made recommendations that weren't present, and the absence of those recommendations directly went to yielding this loss, according to Kostler's own theory of what happened, that when they called for a tug to move the barge, when Mr. Gunderson called for a tug to move the barge, he waited hours for a tug to arrive, and by the time it arrived, the barge had already been damaged and sank. Just an actual question. Going to the withheld payments issue, are the withheld Triton payments just only the $290,000 in pure damage that's listed on page 1643 of the appendix, or do they show up in other parts of the Kostler's claim as well? I'm sorry, Your Honor. I didn't quite catch that. Can I have it again? Are the withheld Triton payments just the $290,000 in pure damage that's listed on page 1643 of the appendix, or do they show up in other parts of the claim as well? There are two elements of Kostler's claim. Number one is the pure damage, which is represented by monies that Triton held back from Kostler. Kostler never paid for that. They never expended anything for that. And Triton's holdback was based upon a formula dictated by the contract between Triton and Kostler. It was not a tort liability measure of damages. It was a measure of damages based upon the details in that contract. The second category, Your Honor, is the cost of wreck removal of the barge. To pick it up off the break it up on site, pick up those pieces, and move it away. So that's the second element of their claim. I hope that answers your question. Yes. Thank you both for your arguments. The Court will reserve decision. Thank you.